IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KHOSROW KOSSY GYALOG                         PLAINTIFF

v.           Civil No. 11-5248

DEPUTY LEBRAULT; DEPUTY
SIMER; SHERIFF FERGUSON; and
CAPTAIN PETRAY                               DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff under the provisions of 42 U.S.C. § 1983. Plaintiff, Khosrow Kossy Gyalog, proceeds *pro se* and *in forma pauperis.*

Gyalog is currently incarcerated in the Arkansas Department of Correction (ADC). However, the claim before me arises out of Gyalog's incarceration in the Benton County Detention Center (BCDC). Specifically, Gyalog maintains that he was denied adequate medical care in the following ways: (1) his pain medication was stolen; and (2) on two separate occasions he was given another inmate's medication. He names as Defendants: Deputy Lebrault; Deputy Simer; Sheriff Ferguson; and Captain Petray.

Defendants filed a motion for summary judgment (Docs. 36-38). Plaintiff was allowed to respond to the motion at the evidentiary hearing. The hearing was held on July 16, 2012. At the hearing, it was determined it would be beneficial to the Court and the parties if Gyalog's ADC medical records were obtained. A subpoena was issued on July 17, 2012 (Doc. 49). There was an error in the address on the subpoena and it was reissued on October 16, 2012 (Doc. 51). The medical records have now been received and are labeled Plaintifft's Exhibit 28. The

summary judgment motion is ready for decision, as is the issue of whether there are triable issues of fact for a jury.

### 1. Applicable Standard

A jury demand has been made in this case. A pretrial evidentiary hearing may be utilized to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Johnson v. Bi–State Justice Center, 12 F.3d 133, 135 (8th Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). When both sides present evidence, the procedure "resembles a summary judgment motion with live evidence." Id. The Court must avoid credibility determinations, believe the Plaintiff's evidence, and draw all justifiable inferences in the Plaintiff's favor. Id. at 136.

### 2. Testimony and Evidence Presented

At the evidentiary hearing, the following witnesses testified: (1) Khosrow Kossy Gyalog, the Plaintiff; (2) Sergeant Michael Barr; (3) Christopher Silva; (4) Ramon Flores; (5) Captain Hunter Petray, a Defendant; (6) Deputy Sauls Lebrault, a Defendant; (7) Deputy Samuel Simer, a Defendant; (8) Sheriff Keith Ferguson, a named Defendant; and (9) Lieutenant Paul Carter.

### Khosrow Kossy Gyalog

Gyalog testified that he was incarcerated at the BCDC from July 9, 2011, until January 29, 2012. At the time of the incidents at issue in this case, he was in convicted status. Gyalog testified he has degenerative disease in his right shoulder, carpal tunnel syndrome in both hands,

AO72A
(Rev. 8/82)

and pinched nerves.[1] As a result of these conditions, he was taking 80 mg of hydrocodone,[2] 60 mg of methadone,[3] and 45 mg of morphine sulfate.[4]

According to Gyalog, his remaining medication was counted after each dose was given. Gyalog asserts there were multiple occasions when the count of his medication was off. Gyalog testified that over a two week period, ninety of his pain pills were missing. On October 16, 2011, Gyalog submitted a grievance directed to Lieutenant Carter asking for an investigation because he believed his medication was being stolen. Plaintiff's Exhibit (hereinafter Plff's Ex.) 1 at pg. 1. Sergeant Barr responded, asking what Plaintiff's issue was and what he was requesting. Id.

Gyalog submitted a second grievance on October 17th. Id. Gyalog testified that after he submitted the second grievance, Sergeant Barr came and asked him what was going on. Gyalog told Sergeant Barr he believed his pain medication was being taken by the guards. While Gyalog maintains the count of his medication was off twenty to thirty times, he testified he never missed any doses of medication. Gaylog testified that the morning after he spoke to Sergeant Barr, he was overdosed and sent to the hospital.

Gaylog explained that the first incident occurred at approximately 5:30 a.m. on October 18th. Gyalog testified he was very groggy from getting up early when he went to the medication

---

[1] Gyalog's ADC medical records indicate he is unable to raise his right arm above his head and crepitus was noted. Court's Exhibit 1 at pg. 6. No mention is made of Gyalog having carpal tunnel syndrome or pinched nerves.

[2] "Hydrocodone is available only in combination with other ingredients, and different combination products are prescribed for different uses. Some hydrocodone products are used to relieve moderate to severe pain. Other hydrocodone products are used to relieve cough. Hydrocodone is in a class of medications called opiate (narcotic) analgesics and in a class of medications called antitussives." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (accessed October 16, 2012).

[3] "Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers. It also is used to prevent withdrawal symptoms in patients who were addicted to opiate drugs and are enrolled in treatment programs in order to stop taking or continue not taking the drugs. Methadone is in a class of medications called opiate (narcotic) analgesics." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html (accessed October 16, 2012).

[4] "Morphine is used to relieve moderate to severe pain. Morphine long-acting tablets and capsules are only used by patients who are expected to need medication to relieve moderate to severe pain around-the-clock for longer than a few days. Morphine is in a class of medications called opiate (narcotic) analgesics." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html (accessed October 16, 2012).

AO72A (Rev. 8/82)

cart. Deputy Lebrault was passing out morning medication. Plff's Ex. 3. Gyalog began having a general conversation with Deputy Lebrault asking how he was doing and other similar questions.

Deputy Lebrault became distracted and handed Gyalog inmate Eric Atkisson's medication consisting of 200 mg of Seroquel, 1 mg of Clonazepam, and 75 mg of Venlafaxine to Gyalog. Plff's Ex. 3. Gyalog looked at the medication and then without saying anything took the medication. Id. Gyalog testified he heard Deputy Lebrault say "oh, shit." Gyalog later discovered he had been given Eric Atkinson's medication.[5]

Gyalog left the medication call line and was on his way back to his cell when he noticed he was dragging his feet and could not pick his feet up. He lost consciousness and was taken to the public restroom[6] and thrown on the bed. A short time later, Gyalog's blood pressure was checked and it was low. The jail nurse sent him to the hospital. Plff's Ex. 3.

Gyalog recalled feeling cold air and then looking up and seeing a guard in the hospital and hearing him say: "this is what he takes and this is what we gave him." The next thing he knew he opened his eyes and was in booking under observation for twenty hours. Gyalog testified that by the next morning he knew what had happened. According to Gyalog, mixing methadone and benzodiazepines, such as Clonazepam, could be fatal.[7] While Gyalog testified that he believes the overdose he was given was an intentional attempt on his life, he has no reason to believe Deputy Lebrault did it intentionally.

---

[5] A video was played that showed Gyalog in line for medication, taking the medication he was given, and then heading towards the pod. Eric Atkinson, the inmate whose pills Gyalog was given, got out of line, presumably because his medication was not there. Plff's Ex. 27.

[6] Inmates are locked out of their cells during the day. The public restroom is a cell left open so the inmates will have access to a toilet and sink.

[7] "Several lines of evidence suggest that benzodiazepines and methadone may have synergistic interactions and that opiate sedation or respiratory depression could be increased." http://www.ncbi.nlm.nih.gov/pubmed/10380152 (accessed October 16, 2012)

AO72A
(Rev. 8/82)

Gaylog testified that on October 19th, Simer gave him someone else's medication. According to Gyalog, Simer had two packages in his hand. Gyalog testified he asked Simer twice if it was his medication and Simer replied that it was. In fact, Gyalog testified he believed Simer was convinced the medication was Gyalog's. Gyalog testified he knew it was not his medication because there was a yellow pill. Gyalog took the medication anyway because Simer had twice said that it was Gyalog's medication.

Gyalog testified Lieutenant Carter later acknowledged that Gyalog had been given the wrong medication and asked Gyalog whether he thought Simer had given him the wrong medication deliberately. Gyalog indicated there was no evidence to show Simer did it intentionally. Gyalog testified that he believed it was an accident and that he suffered no side effects that he is aware of.

Gyalog testified that Sheriff Ferguson had no personal involvement in the incidents themselves. However, if they were an attempt on his life, Gyalog maintains the order must have come from someone up the chain of command.

Gyalog testified that following the October 18th overdose, he was told he had a slight heart murmur. He also stated that he began suffering from extreme night trauma, an inability to sleep, and nervousness. See e.g., Plff's Ex. 4. When he arrived at the ADC, Gyalog was taken off all pain medications he was on at the BCDC and prescribed nortriptyline[8] and rantidine.[9] Court's Exhibit 1 at pg. 30. His intake physical shows no indication of a heart murmur. Id. at pgs. 6-8, 28. ADC medical records indicate that on March 23, 2012, he sought care for extreme

---

[8]"Nortriptyline is used to treat depression. Nortriptyline is in a group of medications called tricyclic antidepressants. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html (accessed on November 5, 2012).

[9]"Ranitidine is used to treat ulcers; gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and injury of the food pipe (esophagus); and conditions where the stomach produces too much acid, such as Zollinger-Ellison syndrome. Over-the-counter ranitidine is used to prevent and treat symptoms of heartburn associated with acid indigestion and sour stomach. Ranitidine is in a class of medications called H2 blockers. It decreases the amount of acid made in the stomach.." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html (accessed November 5, 2012).

AO72A
(Rev. 8/82)

night trauma, stress, anxiety, depression, tension headaches, and heart palpitations from an overdose in November of 2011. Id. at pg. 22. He was seen by a nurse on March 26th and referred to a doctor and to mental health. Id. at pg. 23. On March 29th, Gyalog denied having any problems. Id.at pg. 29. In September, Gyalog requested that his physical restrictions be removed so that he could particiate in the work release program. Id. at pg. 30.

**Sergeant Michael Barr**

Sergeant Barr testified that in October of 2011 he worked in the jail. When asked to review the grievance submitted by Gyalog on October 16th, stating that he believed his medication was being stolen, Sergeant Barr could not recall the grievance. Plff's Ex. 1 at pg. 1. Although he had no recollection of it, Sergeant Barr testified the response and signature were in his handwriting. Id.

**Chris Silva**

Silva testified he was incarcerated at the BCDC in October of 2011. He recalled the events of October 18th. Silva was in the line to get his medication at the same time as Gyalog. Medication was dispenced by putting each inmate's medication into a cup that is then handed to the inmate. On October 18th, Silva noticed Gyalog take a cup and put it to his mouth. After Gyalog took the medication and returned to the barracks, he appeared to be unconscious, with his eyes open. Gyalog was then sent to the hospital.

On October 19th, Silva was in line to get his medication at the same time Gyalog was. Silva heard Gyalog asking if it was his medication he was being given.

**Ramon Flores**

Flores testified that he was incarcerated in the BCDC during October of 2011. He was in the medication line that day and saw Gyalog take the medication. After Gyalog took the medication, Flores heard Deputy Lebrault use a "cuss word."

Flores noted that Gyalog was very pale and clumsy after taking the medication. Flores observed Gyalog passing out in the public restroom.

### Captain Petray

Captain Petray testified that in 2011 he was, and still is, the administrative captain at the Sheriff's Office in charge of civil process. He testified that he had no connection with the events of 2011. Following this testimony, Gyalog indicated he wanted to dismiss all claims against Captain Petray.

### Deputy Saulo Lebrault

Deputy Lebrault testified that in October of 2011, he worked as a jailer. As of October 18th, in fact, until this lawsuit was filed, he had no knowledge that Gyalog had made complaints about missing medication.

Deputy Lebrault testified the medication cart is kept locked. At medication call, it is unlocked and must be alphabetized. When an inmate comes to the cart, the blister pack and/or envelope of his medication is pulled. Deputy Lebrault was not sure how he pulled Atkinson's medication instead of Gyalog's. Deputy Lebrault testified that when he gave the medication to Gyalog, he said nothing about the medication not being his. Inmates are allowed to refuse medication.

Deputy Lebrault denied intentionally giving Gyalog the wrong medication. He testified that when he initially discovered that Atkinson's medication was missing he did not realize he had given the medication to Gyalog. When Deputy Lebrault saw Gyalog on the floor, he realized he must have given Atkinson's medications to Gyalog. Deputy Lebrault notified his sergeant and the nurse. They took over and got Gyalog to the hospital.

### Deputy Samuel Simer

Sims testified that he was working in the BCDC in October of 2011. He was not aware of Gyalog making any complaints about missing medication.

Simer testified that when an inmate comes to the medication cart, the deputy gets his envelope out. The envelope is then matched up with the medication log. Narcotics come in a blister pack. After giving the inmate his medication, the remaining pills are counted and the count recorded on a narcotic sign out sheet. See e.g., Plff's Ex. 2. The medication envelopes are prepared by a third party vendor. Simer testified that in Gyalog's case, on October 19th, there were two envelopes with his name on them. Simer testified he put the medications in a cup and handed the cup to Gyalog and Gyalog took the medicaton.

Simer testified that Gyalog later came up and said there had been a mistake with his medication. Simer looked at the envelopes again and both had Gyalog's name on them. Simer denied intentionally giving Gyalog the wrong medication.

### Sheriff Keith Ferguson

Sheriff Ferguson testified that he had no knowledge of Gyalog making complaints about missing medication. In fact, Sheriff Ferguson stated that it was the first time in ten years that he had heard about any medication missing from the jail. He stated he had no involvement with inmate medication. Complaints are handled by first line supervisors and only make it to the Sheriff's level if others below him in the chain of command cannot figure out how to handle it.

### Lieutenant Paul Carter

Lieutenant Carter testified he was the jail lieutenant in 2011. He looked into Gyalog's complaints and found the discrepancies on the sign out sheet were largely the result of mis-counting and double entries. He testified there were certainly not the quantity of pills missing claimed by Gyalog.

Lieutenant Carter testified he quickly compared the narcotic sign out sheet entries with the entries on the medication administration record for September and October. He proceeded with the assumption that the counts would be sporadically off by one to two pills. In his opinion, the entries would be more than one pill off if someone was stealing them. He did not personally count the medication and did not speak to any of the deputies. He could not explain the morphine sign out sheet which showed an end count of 105 on October 11th, with the first entry for October 12th showing an end count of only 64. Plff's Ex. 2 at pg. 6. However, I note that the same sign out sheet shows the remaining count to only be 68 when the first dose for October 11th was dispensed. Id. The next entry shows the remaining count as 107. Id.

Lieutenant Carter indicated he spoke with Gyalog about this but did not share his findings with anyone else. Lieutenant Carter did, however, speak to Simer when he was inquiring about whether Simer had given Gyalog the wrong medication on October 19th. Lieutenant Carter testified he advised Simer to slow down during medication distribution.

### 3. Discussion

"The Eighth Amendment prohibits cruel and unusual punishment of a person convicted of a crime." Taylor v. Dormire, 690 F.3d 898, 902 (8th Cir. 2012). "[P]rison officials must ensure that inmates receive adequate . . . medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994)(citation and internal quotation marks omitted). "It is well established that deliberate indifference to an inmate's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment. McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012)(citations omitted). To establish deliberate indifference, a plaintiff must "prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." Nelson v. Corr. Med. Servs., 583 F.3d 522, 531-32 (8th Cir. 2009)(citations omitted).

### (A). Missing Medication

Gyalog believed large numbers of his pills were being taken or misappropriated by unidentified jail personnel. While review of the medication logs suggests that there were either errors in counting or missing medication, there is no discernable pattern and Gyalog provides no evidence that this resulted from the actions of one or more of the named Defendants. Perhaps more importantly, Gyalog indicates he never missed a dose of medication because of the alleged misappropriations.

### (B). October 18th Medication

It is undisputed that Deputy Lebrault gave Gyalog the wrong medication. However, at most, the evidence presented suggests only that Deputy Lebrault acted negligently in doing so. See e.g., Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)(even gross negligence is insufficient for an Eighth Amendment claim). There was certainly no evidence from which it can be inferred that Deputy Lebrault did so intentionally, in response to, or in retaliation for, Gyalog's submission of grievances regarding missing medication. Gyalog's grievances do not name any jail personnel allegedly involved in misappropriating the medication. Plff's Ex. 1. The grievances themselves were not received, or responded to, by Deputy Lebrault. Id. The investigation was performed by Lieutenant Carter. There is no evidence suggesting he spoke to, or communicated with, Deputy Lebrault. In fact, Lieutenant Carter testified he did not talk with any of the deputies and did not share his findings with them. Moreover, while Gyalog believes there may have been an order from Sheriff Ferguson or some other person high in the jail command, there is absolutely no evidence suggesting such an order was made.

### (C). October 19th Medication

With respect to the incident on October 19th when Simer dispensed a "yellow pill" to Gyalog that was not prescribed to him, nothing in the record suggests this was the result of

-10-

anything other than negligent conduct. <u>Daniels v. Ferguson</u>, 321 Fed. Appx. 531, *1 (8th Cir. 2009)(undisputed evidence shows that at most officer acted negligently in dispensing the wrong medication).  Strangely, Gyalog took the medication despite the fact that he knew it was not his medication.   There is no evidence that Simer acted with deliberate indifference to the serious medical needs of Gyalog.

### **4. Conclusion**

I recommend that Plaintiff's oral request to dismiss all claims against Captain Petray be granted.  Further, I recommend that Defendants' summary judgment motion (Doc. 36) be granted and the case be dismissed.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 7th day of November 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)